IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No. 21-cv-00240-CMA-KAS

CHRIS WOOLEY,

     Plaintiff,

v.

INDIGO AG, INC.,

     Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant Indigo Ag, Inc.'s ("Indigo") Motion for Summary Judgment (Doc # 199). For the following reasons, the Court grants in part and denies in part the Motion.

## I.    BACKGROUND

**A.    FACTUAL BACKGROUND[1]**

This is an employment discrimination case. Plaintiff, Chris Wooley, is an African American man who was 49 years old in December 2018 when he began working as the High Plains Regional Account Manager ("RAM") for Indigo. (Doc. # 69 at 8; Doc. # 199-1 at 1.) When Mr. Wooley began his employment with Indigo, he had more than 20

---

[1] Unless otherwise indicated, the following facts are undisputed. (Doc. # 199 at 5–17; Doc. # 208 at 2–11; Doc. # 209 at 4–9.)

years of experience in agriculture. (Doc. # 208-2 at 1, 10.) At the time he was hired, Mr. Wooley was the only African American RAM. (Doc. # 208-1 at 5.) During Mr. Wooley's tenure with Indigo, he was the oldest or second oldest RAM. (Doc. # 202 at 2.) Mr. Wooley alleges that Indigo terminated him on May 7, 2019, on account of his race and age. *See generally* (Doc. # 46.)

1. Conditions at Indigo

Indigo experienced high turnover in and around 2019. (Doc. # 199-21 at 2; Doc. # 203 at 1–2.) Mr. Wooley was the third person to hold the RAM position for the High Plains region in the 2018 calendar year. (Doc. # 199-21 at 1.) According to a redacted chart submitted by Indigo which appears to list 192 employees on Indigo's Commercial Sales team hired between July 5, 2017, and May 3, 2021,[2] 145 of these employees were terminated between May 6, 2019, and July 1, 2022. (Doc. # 203.) Of the 145 terminated employees, 54 were age 40 or older at the time of their termination. (*Id.*) Of the 47 "active" employees as of the unknown date of this chart, 19 were age 40 or older. (*Id.*) Despite this high turnover rate generally, only one other RAM, Tony Babe, a 49-year-old white man, was terminated in 2019. (Doc. # 202 at 2.)

Indigo asserts that in the fourth quarter of 2018, it launched a new business unit supporting farmers and buyers of grain in grain marketing, which Rachel Raymond—

---

[2] The chart contains no titles or explanation but is cited to by Indigo as a list of "employees on the Commercial Sales team." (Doc. # 199 at 16.) Mr. Wooley does not dispute Indigo's facts related to this chart (Doc. # 208 at 6), but it appears to the Court that Indigo's numbers are slightly off (the Court counts 192 total listed employees, 74 of whom are age 40 or over, of which 54 are listed as terminated). (Doc. # 203 at 1–2.) The ages of three employees are not provided. (*Id.*)

Indigo's then-Chief Operating Officer, North America—testified "is a very different set of skills and requirements than [] our initial and previous area of focus . . . selling agricultural inputs." (Doc. # 199-4 at 6.) Mr. Wooley did not have prior grain marketing experience. (Doc. # 199-3 at 6, 12.) However, Mr. Wooley disagrees grain marketing requires a different skill set from selling agricultural inputs, stating that both require "a similar knowledge of several agricultural areas, including grower prince points and expenses and market dynamics." (Doc. # 208-2 at 3.) Mr. Wooley also asserts that grower offers, rather than grain marketing, was Indigo's focus during his tenure. (Doc. # 199-9 at 1; Doc. # 200 at 3.)

Several of Mr. Wooley's team members attested that they struggled to meet Indigo's quotas for various reasons including grower resistance to Indigo's prices and Indigo's quota-setting procedures. (Doc. # 208-3 at 3, 6, 9.) Ms. Raymond also testified that many RAMs and sales team members "communicated to [her] that they hadn't figured out yet how to hit their quotas." (Doc. # 208-6 at 4.)

2. Mr. Wooley's Sales Successes and Challenges

Mr. Wooley began reporting to Ms. Raymond in January 2019. (Doc. # 199-3 at 3; Doc. # 199-4 at 4.) Ms. Raymond supervised Mr. Wooley through his discharge on May 7, 2019.[3] (Doc. # 199-5 at 4.) In the first quarter ("Q1")—January through March—of 2019, Mr. Wooley's High Plains region had the highest percentage of grower profit

---

[3] Garett Cole took over the supervision of all RAMs on May 1, 2019. However, Ms. Raymond continued to supervise Mr. Wooley. According to Indigo, this is because Mr. Wooley's Performance Improvement Plan—discussed in detail below—pre-dated Mr. Cole's start date. (Doc. # 199-5 at 4.)

3

attainment—between 92% and 96%.[4] (Doc. # 199-8; Doc. # 208-2 at 3, 13.) This earned Mr. Wooley the highest sales plan incentive ("SIP") bonus, over $9,200, amongst the RAMs. (Doc. # 202 at 2.)

However, Mr. Wooley's team also had the highest percentage (50%) of Key Account Managers ("KAMs") performing in the bottom quartile of their metrics. (Doc. # 199-4 at 8; Doc. # 199-8 at 1.) Ms. Raymond, explains this discrepancy by asserting that Mr. Wooley's team did well in Q1 "despite his lack of management and leadership" because his team included "a couple of account managers performing in the top quartile at the end of the first quarter, which were people that he didn't hire, they had worked with the company prior to him joining." (Doc. # 199-4 at 8–9.) Thus, according to Ms. Raymond, the high quota for grower profits attained in Q1 by Mr. Wooley's team, and Mr. Wooley's correspondingly high SIP bonus, are "flawed" metrics which did not capture his job performance. (*Id.* at 9.)

On March 10, 2019, Ms. Raymond told Mr. Wooley in an email that his team needed to improve performance around grower offers, which she asserted was the "most important goal for the company [that] quarter." (Doc. # 199-7 at 1; Doc. # 199-9 at 1.) Mr. Wooley's email in response agreed with the need for improvement while also discussing challenges he perceived to be impacting his team's traction on that goal including market sentiment, declining markets, farmers' schedules and lack of

---

[4] Indigo admits this fact and asserts that the final quota attainment was 93%. (Doc. # 209 at 6 (citing Doc. # 210.))

engagement, and logistics. (Doc. # 199-7 at 1.) Mr. Wooley also acknowledged his team's goal but forecasted the team would hit half the goal that week. (*Id.*)

On April 5, 2019, mere days into the second quarter of 2019 ("Q2"), Ms. Raymond called Mr. Wooley and "expressed the gap between performance and expectation and the importance of a shift in this performance to the company and team." (Doc. # 199-9 at 1.) According to Mr. Wooley, April and May were difficult times of year in the High Plains region to secure grower offers due to various factors including climate and crop selection. (Doc. # 208-2 at 4.) Thus, Mr. Wooley asserts, GAMs[5] in his region spent the spring months building relationships with growers. (*Id.*) According to then-Indigo consultant Garrett Cole, all RAMs "had some reason for their climate being different and unique." (Doc. # 208-4 at 6.)

In an email to Indigo's executives summarizing the April 5 call, Ms. Raymond stated that Mr. Wooley "blame[d] the market" and Indigo's "lack of marketing tools" for his team's performance but eventually stated that he "would work on it." (Doc. # 199-9 at 1.) Ms. Raymond told the executives she would implement weekly check-in meetings and "additional touchpoints" to make her expectations clear. (*Id.*)

3. Coaching, Team Morale, and Attitude

As a RAM, one of Mr. Wooley's job duties was to coach his sales team members. (Doc. # 199-6 at 1.) As such, Mr. Wooley's job performance depended, in part, on his

---

[5] Both parties refer to "GAMs" but do not define this acronym, explicitly state its role in Indigo's hierarchy, or describe how it differs from or relates to "Key Account Managers" or KAMs. *See, e.g.*, (Doc. # 199 at 8, 10, 14; Doc. # 208 at 4, 7, 9–10, 13–15, 19.) From context, the Court discerns that GAMs are sales team members overseen by the RAMs.

ability to lead his team members to hit performance goals set by Indigo. (Doc. # 199-4 at 8; Doc. # 208-8 at 7.) Indigo, and specifically Ms. Raymond as Mr. Wooley's supervisor, had the prerogative of assessing Mr. Wooley's job performance, including his coaching. (Doc. # 199-3 at 7, 10); *see also* (Doc. # 199-6 at 1.) Several of Mr. Wooley's former team members attested positively to Mr. Wooley's leadership and coaching, stating for example that Mr. Wooley "exhibited a positive attitude," "[w]as a good manager[, and] provided leadership," "worked hard to improve morale," and "was an excellent supervisor." (Doc. # 208-3 at 3, 5–6, 8.) Additionally, although Indigo asserts, relying on Ms. Raymond's deposition testimony, that Mr. Wooley's coaching was undermined by his "state[ing], repeatedly and publicly, that goals were unachievable" (Doc. # 199 at 7 (citing Doc. # 199-4 at 9, 19)), the affidavits of Mr. Wooley's former supervisees contradict Mr. Raymond's testimony. *See* (Doc. # 208-3 at 3, 9.)

In mid-February 2019, Ms. Raymond and Mr. Cole accompanied Mr. Wooley on a field visit/sales call with then Indigo-GAM Aaron Gaspar. (Doc. # 208-2 at 3.) Ms. Raymond testified that during this observation Mr. Wooley did not coach Mr. Gaspar,[6] and Mr. Gaspar's morale was low. (Doc. # 208-7 at 8.) Mr. Gaspar resigned later that month. (Doc. # 208-5 at 2.) In an email sent to Ms. Raymond and Mr. Cole on February 26, 2019, Mr. Gaspar provided a summary of observations regarding Indigo's "execution

---

[6] Indigo has not provided the Court with the deposition testimony it cites in support of this fact, however, Mr. Wooley admits it. *See* (Docs. # 199 at 7 (citing Doc. # 199-4 at 7); Doc. # 208 at 3 n.2.)

and communication from leadership to the field" which he opined were "extraordinarily frustrating from an Account Manager's perspective." (*Id.*)

    4.    <u>Territory Division</u>

Mere days after he began his employment with Indigo, Mr. Wooley was advised of plans to redraw Indigo's geographic sales territories. (Doc. # 199-19 at 1.) In early March 2019, Indigo announced that Mr. Wooley's region, High Plains, would be divided into two parts—Eastern High Plains and Western High Plains—the following month. (Doc. # 199-20 at 1–2; Doc. # 208-2 at 4.) Jordan Flynn, a 31-year-old white man and previous KAM/GAM under Mr. Wooley, was promoted to RAM for the Eastern High Plains region. (Doc. # 199-21 at 2; Doc. # 202 at 2; Doc. # 208-2 at 4.) Mr. Flynn described his territory as "ground zero" for Indigo, and Ms. Raymond testified that it was the area of the country where Indigo had "honed its offerings" and "had [put in] the most investment and time." (Doc. # 208-7 at 4–5.) Indigo's Director of Talent Strategy observed that Mr. Flynn's success in his territory may be related to the match between geography ("a grain hub"), and Mr. Flynn's skillset ("excellent grain marketing knowledge"). (Doc. # 208-9 at 2.)

    5.    <u>PIP and Termination</u>

Less than two weeks into Q2, Ms. Raymond placed Mr. Wooley on a Performance Improvement Plan ("PIP"). (Doc. # 199-10.) The PIP listed four "Areas of focus": (1) "Team performance and morale," (2) "Emphasis on outcomes," (3) "Clear messaging to the team on alignment with Indigo priorities," and (4) "Problem solving and solution orientation." (*Id.*) Under the first category, "examples"—presumably of the need

7

for improvement in that area—included "Multiple team members with 0 grower offers and 0 acres on a weekly basis," and "Team morale among lowest based on 1:1 conversations." (*Id.*) Ms. Raymond told Indigo's Commercial Recruitment Manager that her assessment of team morale was based off conversations with Mr. Gaspar and Mr. Flynn, although she couldn't "recall specifically if any individual said the words 'I have low morale.'" (Doc. # 208-6 at 3, 5; Doc. # 208-7 at 8.)

"Examples" provided in both the second and fourth categories of the PIP indicated concerns with what Ms. Raymond perceived as Mr. Wooley's lack of accountability. (Doc. # 199-10.) Finally, in the "Clear messaging to team" category, "Team unaware of highest priority on grower offers" was listed as an example. (*Id.*) The PIP was originally put in place for two weeks and then extended to May 7, 2019, for a total of 26 days. (*Id.*; Doc. # 200 at 3.)

Ms. Raymond and Mr. Wooley had a progress review on April 30, 2019, and a second meeting was set for May 7, 2019, at 7:30 a.m. (Doc. # 199-11 at 1–2, 4; Doc. # 199-12 at 1.) On May 6, 2019, during an email exchange, Ms. Raymond explained to Mr. Wooley that she had assessed team morale to be low "based off of conversations [with] your team members and as evidenced by regrettable loss of one of the 2 highest contributing members of your team." (Doc. # 200 at 3.) Ms. Raymond also stated that her characterization of team achievement was based on Mr. Wooley's region having "75% of GAMs performing under the minimum amount of 5% of their grower offer quotas" which was "the lowest percentage across all teams in the US for which [grower offers] is their primary goal in Q2." (*Id.*) Mr. Wooley responded by asserting that (1) if

Ms. Raymond's reference to low morale referred to Mr. Gaspar, his dissatisfaction preceded Mr. Wooley's employment with Indigo, and (2) that Mr. Wooley's team members were working hard to achieve their goals, but the Western High Plains region did not currently have sufficient capacity. (*Id.* at 2.) In this same email exchange, Mr. Wooley twice asked whether the purpose of the next day's meeting was "separation from the company or a demotion?" (*Id.*)

As he expected, Ms. Raymond terminated Mr. Wooley the following morning. (Doc. # 199-5 at 3.) During the termination meeting, Mr. Wooley asked Ms. Raymond about other jobs at Indigo. (Doc. # 199-3 at 13; Doc. # 199-17 at 1.) Ms. Raymond invited Mr. Wooley to apply for other open positions and offered to talk with him about positions that interested him. (Doc. # 199-17 at 2.)

Following Mr. Wooley's termination, Mr. Flynn temporarily oversaw the Western High Plains region for a few weeks, after which he continued to be the RAM only for his Eastern High Plains region. (Doc. # 199-5 at 5; Doc. # 199-21 at 2.) In June 2019, Indigo integrated Mr. Wooley's former territory into the North Central Region assigned to Mr. Babe, a 49-year-old white man, as RAM. (Doc. # 199-5 at 5; Doc. # 199-24 at 5; Doc. # 202.)

      6.     <u>Mr. Wooley's Complaint of Discrimination</u>

At 9:44pm on May 6, 2019—the day before his termination—Mr. Wooley submitted by email a complaint of discrimination to Indigo's Human Resources department. (Doc. # 199-12 at 1; Doc. # 199-15 at 2.) In late May Indigo's in-house counsel investigated Mr. Wooley's complaint, reviewing documents, and interviewing

9

four witnesses. (Doc. # 199-5 at 7.) One of the witnesses told the investigator she "knew what [Ms. Raymond] was referring to as the reasons for her being disappointed in Mr. Wooley." (Doc. # 199-18 at 4.) The investigation concluded that "(a) there was nothing unusual or improper about Plaintiff's termination, (b) the reason for termination were reasonable and legitimate, and (c) Plaintiff's allegations were found to be unsubstantiated." (Doc. # 199-5 at 7.) However, the investigator did not take any notes or issue a formal written report. (Doc. # 208-1 at 4.)

During his deposition for this case, Mr. Wooley testified that he does not recall any derogatory comments based on age or race at Indigo. (Doc. # 199-3 at 4–5.) When asked what prompted Mr. Wooley to complain of discrimination, he described instances where he believed he was treated differently from other RAMs and testified, in part, "what else – what else is going on here? What else can it be?" (*Id.* at 11); *see also* (*id.* at 3.)

      7.    <u>Post-Employment</u>

On May 23, 2019, Mr. Wooley applied for a KAM Transport position with Indigo. (Doc. # 69 at 5; Doc. # 199-3 at 14.) Mr. Wooley also sought reappointment to his RAM position following his discharge. (Doc. # 199-3 at 15.) In September 2019, Indigo offered to reemploy Mr. Wooley as the Head of North America Microbiome Business. (Doc. # 199-25 at 1.) This was a newly created position. (Doc. # 208-10 at 3–4.) The offer letter for this position stated that it would report to Ms. Raymond, described a compensation package identical to the one Mr. Wooley received as a RAM, and stated that the offer would expire in three days, although that was later extended for an additional three

days. *Compare* (Doc. # 199-25 at 1), *with* (Doc. # 199-1 at 1); *see also* (Doc. # 199-3 at 16; Doc. # 209-1 at 1.) Mr. Wooley, who had found substitute employment two months prior, considered the position, but ultimately let the offer expire without accepting. (Doc. # 199-3 at 18; Doc. # 208-2 at 6–7.) Indigo never filled the position. (Doc. # 199-5 at 6.)

**B.    PROCEDURAL HISTORY**

On January 25, 2021, Mr. Wooley filed this lawsuit. (Doc. # 1); *see also* (Doc. # 46) (the operative complaint). His Amended Complaint brings claims of (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), and the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401 *et seq*. ("CADA"); (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), and CADA; (3) Retaliation; and (4) Failure to Hire due to Race/Color/Age. (Doc. # 46 at ¶¶ 42–70.) In November 2021, Indigo moved to dismiss all of Mr. Wooley's claims. (Doc. # 52.) The Court granted dismissal of Mr. Wooley's fourth claim (Failure to Hire) but denied the motion in all other respects. (Doc. # 110.) Indigo filed the instant Motion for Summary Judgment on November 13, 2023. (Doc. # 199.) The Matter is now ripe for review. *See* (Docs. ## 208–09.)

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*,

11

259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th

Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

### III. ANALYSIS

#### A. "SHAM AFFIDAVITS"

As an initial matter the Court notes that Indigo makes a perfunctory argument that the Court should disregard Mr. Wooley's affidavit and, apparently,[7] those of three former supervisees—submitted by Mr. Wooley in opposition to the instant Motion (Docs. ## 208-2, 208-3)—as "ineffective and sham affidavits [written] to construct artificial issues." (Doc. # 209 at 4); *see also* (*id.* at 11 (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 974 (10th Cir. 2001).)

In *Ralston*, the United States Court of Appeals for the Tenth Circuit held that the district court did not abuse its discretion in excluding an affidavit that "directly contradicted certain positions previously taken by [the affiant]" because the circumstances supported a conclusion that the affidavit sought to create a "sham fact issue." 275 F.3d at 973 (emphasis omitted). In reaching that conclusion, the Tenth Circuit identified three factors relevant to "whether a contradicting affidavit seeks to create a sham fact issue": (1) whether "the affiant was cross-examined during his earlier testimony"; (2) whether "the affidavit was based on newly discovered evidence"; and (3) whether "the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* "However, before applying the *Ralston* factors, a court must determine whether the

---

[7] Indigo refers to "sham affidavits" (plural) (Doc. # 209 at 4), thus, the Court presumes that it believes all four affidavits submitted by Mr. Wooley in support of his Response are shams and should be disregarded.

affidavit at issue directly contradicts the previous deposition testimony." *Miller v. State Farm Mut. Auto Ins. Co.*, No. 21-cv-00216-PAB-STV, 2023 WL 2140105, at *3 (D. Colo. Feb. 21, 2023) (citing *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014) (holding that a witness's affidavit did not "fit[ ] the sham affidavit paradigm" because it did not "contain any allegations that would directly contradict [the witness's] earlier deposition testimony") (internal quotation marks omitted); *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (finding that the district court abused its discretion by excluding affidavits without first identifying how they conflicted with prior deposition testimony)).

     Defendants argue that Mr. Wooley's affidavit is a sham because he attests that he was interested in being reemployed by Indigo because he needed money, although he "previously testified that he 'wanted' to go back to work at Indigo because he 'loved' it." (Doc. # 209 at 11.) Indigo also appears to allege that Mr. Wooley must not genuinely believe Indigo discriminated against him because he testified that he would not want to work for a company that discriminates (Doc. # 199-3 at 8), while also seeking reemployment with Indigo (*id.* at 13–15; Doc. # 199-17 at 1–2).

     The latter alleged "inconsistency" appears within Mr. Wooley's testimony and between Mr. Wooley's testimony and other evidence in the record. Thus, it does not fall within the sham affidavit framework which permits courts to disregard affidavits only where they directly contradict the affiant's own testimony. *Knitter*, 758 F.3d at 1218 n.3; *Law Co.*, 577 F.3d at 1169. To the extent that Indigo asserts Mr. Wooley's affidavit contradicts this testimony because he states "[a] significant factor in my efforts to return

to work at Indigo after I was fired was simply that I needed income" (Doc. # 208-2 at 6), the Court does not find this directly contradictory. *See Knitter*, 758 F.3d at 1218 n.3 (requiring, amongst other things, direct contradictions between an affidavit and the affiant's deposition testimony for the court to strike the affidavit or portion thereof); *Law Co.*, 577 F.3d at 1169 (explaining that it constitutes an error of law for a court to exclude an affidavit without identifying a contradiction to the affiant's deposition testimony). It is entirely possible that someone might prefer not to work for a company that he feels discriminated against him, while also reapplying to that company due, in part, to a need for income.

As it relates to Mr. Wooley's reasons for seeking reemployment with Indigo, the Court also finds no direct contradiction between Mr. Wooley's testimony and his affidavit. The portion of Mr. Wooley's deposition testimony upon which Indigo appears to rely is:

> Q: Were you wanting to be reinstated as a regional account manager?
> A: I would say, yeah. I mean, . . . I did in a way because that's what I loved to do, and we had a successful – successful business. And I was scratching my head why I got fired in the first place after delivering the numbers that we delivered. So yeah, I love my team. I loved working hard, and I loved the – moving the Indigo message out there.

(Doc. # 199-3 at 15.) It is not inconsistent for Mr. Wooley to be interested in rejoining Indigo because he loved his job and because he needed income. Neither Mr. Wooley's testimony nor his affidavit indicate that one reason was to the exclusion of all others. In fact, his affidavit asserts that his need for income was "a significant factor"—as opposed to the sole factor—why he sought reemployment with Indigo. (Doc. # 208-2 at 6.)

Regarding the three affidavits of Mr. Wooley's former supervisees, Indigo does not indicate that these affiants were deposed, let alone point to specific contradictions between the affidavits and any deposition testimony. Any differences of opinion between the affiants and Ms. Raymond do not fall within the sham affidavit framework. Therefore, the Court will not disregard any of the affidavits, in whole or in part, filed by Mr. Wooley in opposition to the instant Motion. *See Knitter*, 758 F.3d at 1218 n.3; *Law Co.*, 577 F.3d at 1169.

**B.   DISCRIMINATION**

   1.   Relevant Law

The *McDonnell Douglas* burden-shifting test applies to Title VII, § 1981, ADEA, and CADA claims where there is no direct evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Johnson v. Weld Cnty.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010) ("Colorado and federal law apply the same standards to discrimination claims."); *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) (applying *McDonnell Douglas* framework to Title VII and ADEA discrimination claims); *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995) (analyzing Title VII and § 1981 discrimination claims pursuant to *McDonnell Douglas*). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of employment discrimination, 411 U.S. at 802, by showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007). If a plaintiff can show that

similarly situated non-minority employees were treated more favorably, this gives rise to an inference of discrimination that satisfies the plaintiff's prima facie burden. *Id.* at 800–01; *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (citing *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082 (10th Cir. 1999)). There must "be a logical connection between each element of the prima facie case and the inference of discrimination." *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (citation omitted).

If the plaintiff makes out a prima facie case, the burden shifts to the defendant to come forward with a legitimate, nondiscriminatory basis for its employment decision. *See McDonnell Douglas Corp.*, 411 U.S. at 802. If the defendant does so, the inference of discrimination drops out and the burden shifts back to the plaintiff.

The plaintiff, then, must offer evidence to show that the defendant's non-discriminatory reason was merely pretext. *See id.* at 804. Here, "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and Cnty. of Denver*, 365 F.3d 912, 924 (10th Cir. 2004) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

2. <u>Application</u>

Indigo does not dispute that Mr. Wooley is a member of a protected class—both in terms of his race, African American, and his age, over 40—and that he suffered an adverse employment action. *See generally* (Doc. # 199.) Therefore, only the third element of Mr. Wooley's discrimination claims is at issue—i.e., that Mr. Wooley's termination took place under circumstances giving rise to an inference of discrimination. *PVNF*, 487 F.3d at 800. Against this legal backdrop, and upon review of the briefing and pertinent record, the Court determines that several genuine disputes of material fact exist and warrant denial of Indigo's Motion for Summary Judgment as to Mr. Wooley's discrimination claims.

Regarding Mr. Wooley's prima facie case, the parties dispute several issues including:

- whether Mr. Wooley's lack of grain marketing skills was material to his qualifications as RAM (Doc. # 199-4 at 6; Doc. # 208-2 at 3);
- whether Mr. Wooley appropriately coached his team members and worked to improve morale (Doc. # 208-3 at 3, 5–6, 8; Doc. # 208-7 at 8);
- whether Mr. Wooley undermined business goals, or otherwise expressed an attitude that Indigo's quotas were impossible, in front of his team (Doc. # 199-4 at 9, 19; Doc. # 208-3 at 3, 9);
- whether Mr. Wooley failed to take responsibility for his team's performance or merely provided necessary, objective context for the challenges his region faced (Doc. # 199-7 at 1; Doc. # 199-9 at 1; Doc. # 200 at 2; Doc. # 208-2 at 4);

- whether it was possible for Mr. Wooley to improve on the objectives laid out in the PIP given the short time frame and limited number of objective markers of success (Doc. # 199-10; Doc. # 200 at 3; Doc. # 208-6 at 3, 5–6; Doc. # 208-7 at 7).

The parties also genuinely dispute whether Mr. Wooley was treated less favorably than similarly situated employees who were not members of Mr. Wooley's protected classes. *PVNF*, 487 F.3d at 800. For example, Mr. Wooley points to evidence that he was the only RAM to so quickly be placed on a PIP and terminated despite the fact that his region performed the highest in Q1 (Doc. # 199-8; Doc. # 202 at 2; Doc. # 208-2 at 3, 13), and many, if not all RAMs, had trouble meeting Indigo's performance metrics. (Doc. # 199-8; Doc. # 208-6 at 4.) Much of the evidence related to Ms. Raymond's alleged reasons for coaching Mr. Wooley regarding his performance, placing Mr. Wooley on a PIP, and ultimately terminating him are directly contradicted by Mr. Wooley and his former supervisees. *Compare* (Doc. # 199-4 at 8–9, 19; Doc. # 199-9 at 1; Doc. # 199-18 at 4–5; Doc. # 200 at 3; Doc. # 208-6 at 3, 5), *with* (Doc. # 200 at 2; Doc. # 208-2 at 3–5; Doc. # 208-3 at 2–3, 5–6, 8–9; Doc. # 208-5 at 2.) It is a matter for the jury to evaluate the credibility of these witnesses. *Allen*, 119 F.3d at 839.

The Court recognizes that Indigo's good faith business judgment, including terminating employees that are not meeting its performance metrics, may not be second guessed. *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308–09 (10th Cir. 2005); *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004). However, there exist genuine disputes of material fact regarding whether such business judgment

was applied across racial and age differences. *See, e.g.*, (Doc. # 202 at 2.) Because of these disputes, summary judgment is inappropriate on Mr. Wooley's discrimination claims. It will be for the trier of fact to weigh the evidence presented by both parties, make credibility determinations, and decide whether Ms. Raymond treated Mr. Wooley less favorably than white and/or younger employees and if her asserted reasons for Mr. Wooley's adverse employment actions were pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 802.

### C. RETALIATION

Mr. Wooley, although not admitting all of Indigo's related statements of fact, concedes that Indigo is entitled to summary judgment on his retaliation claim. (Doc. # 208 at 21.) Therefore, the Court grants summary judgment in favor of Indigo on this claim.

### IV. CONCLUSION

For the foregoing reasons, Defendant Indigo Ag, Inc.'s Motion for Summary Judgment (Doc # 199) is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to Plaintiff's Third Claim for Relief – Retaliation (Doc. # 46, ¶¶ 57–62). The Motion is DENIED with respect to all other claims.

DATED: April 4, 2024

BY THE COURT:

_Christine M. Arguello_
CHRISTINE M. ARGUELLO
Senior United States District Judge